**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ALYSSA LEITE, on behalf of herself and minor children, | |
| Plaintiffs, | Civil Action No.    1:22-cv-10720 |
| v. | |
| PEMBROKE HOUSING AUTHORITY and ROCKLAND HOUSING AUTHORITY | |
| | VERIFIED CIVIL RIGHTS COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF |
| Defendant. | |

## INTRODUCTION AND NATURE OF THE CASE

1. This is an action for damages and declaratory and injunctive relief under 42 U.S.C. § 1983,
   42 U.S.C. § 1988, and the due process clause of the Fifth and Fourteenth Amendments,
   requesting review and reversal of a May 31, 2020 termination executed by the Pembroke
   Housing Authority and the Rockland Housing Authority (the "PHA" or the "Defendants")[1]
   of Plaintiff Alyssa Leite ("Ms. Leite") and her minor children's (collectively "Plaintiffs")
   participation in the Section 8 Housing Choice Voucher Program. ("Section 8 Program").
   The PHA's decision to terminate Plaintiffs' participation in the Section 8 Program was
   erroneous, unsupported by sufficient facts, based on discriminatory animus, and violated
   Plaintiffs' constitutional right to due process, for, among other reasons, the vague and

---

[1]     On or about December 1, 2019, the Pembroke Housing Authority represents that it issued a letter to all landlords, property owners, and voucher recipients of the Rockland Housing Authority that the Pembroke Housing Authority was taking over the entire Rockland Housing Authority's Section 8 Administration. Plaintiffs use PHA interchangeably in this Complaint to refer to each entity.

insufficient notices and policies on which the PHA based its termination, which prejudiced Plaintiffs' ability to maintain their voucher and remain in the program.

2. Plaintiffs, by and through their attorneys, seek a declaration that their civil rights were violated when the PHA terminated their Section 8 Program voucher subsidy (the "Voucher") without due process of law; an injunction reinstating the subsidy under the terms and conditions it was previously issued or under such terms and conditions as subsidies are presently issued by the PHA to the extent they do not conflict with applicable law; money damages for injuries proximately caused by and reasonably foreseeable from the improper termination of said subsidy; and punitive damages.

## JURISDICTION AND VENUE

3. Jurisdiction over federal claims is proper in the District of Massachusetts pursuant to 28 U.S.C. § 1331 and 1343(a)(2),(3), and (4);

4. Jurisdiction over state claims is proper pursuant to 28 U.S.C. § 1367(a), as the state law claims are part of the same case and controversy as the federal claims.

5. Venue is proper in the District of Massachusetts pursuant to 28 U.S.C. § 1391(b)(1) because Plaintiffs are residents of the Commonwealth of Massachusetts and, upon information and belief, Defendants are residents of the Commonwealth of Massachusetts.

6. Venue is further proper in the District of Massachusetts pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to this claim occurred in the District of Massachusetts.

## PARTIES

7.  Plaintiffs Alyssa Leite and two of her minor children reside at an apartment at the Hanover Woods housing complex (the "Unit"). Ms. Leite has resided at the Unit since August 1, 2019.

8.  Defendant Pembroke Housing Authority is a public body politic and corporate created under G.L. c. 121B § 3 with a principal place of business at 6 Kilcommons Dr., Pembroke, MA 02359. It is responsible for administering and overseeing the federally funded Housing Choice Voucher program under Section 8 of the United States Housing Act of 1937 (42 U.S.C. § 1437f) and, upon information and belief, administered Plaintiffs' Section 8 rental subsidy from December 2019 until June 2020.

9.  Defendant Rockland Housing Authority is a public body politic and corporate created under G.L. c. 121B § 3 with a principal place of business at 8 Studley Court, Rockland, MA 02370. It is responsible for administering and overseeing the federally funded Housing Choice Voucher program under Section 8 of the United States Housing Act of 1937 (42 U.S.C. § 1437f) and, upon information and belief, granted and administered Plaintiffs' Section 8 rental subsidy from August 2019 until December 2019.

## STATEMENT OF FACTS

10. Plaintiffs were participants in the Section 8 Program administered by the PHA.

11. The PHA administers the Section 8 Program in furtherance of the Program's statutory purpose of addressing the shortage of safe or sanitary dwellings available for families or elderly persons of low income at rentals that they can afford. G.L. c. 121B, § 3.

12. On or about July 2012, Ms. Leite completed a Section 8 Housing Voucher Program Centralized Waiting List Pre-Application. At the time, Ms. Leite was living in a domestic violence shelter.

13. On or about December 2018, over five years later, Ms. Leite submitted to the Rockland Housing Authority other information in connection with her Application for Federally Assisted Housing and Rockland Housing Authority Preliminary Rental Application.

14. The Rockland Housing Authority maintains a "Section 8 Administrative Plan," (the "Administrative Plan") which it last amended in September 2012.

15. The Section 8 Administrative Plan lists several grounds through which the Rockland Housing Authority may consider discretionary termination of a family's Section 8 Voucher.

16. Regarding those discretionary grounds for terminations, the Section 8 Administrative Plan notes that the Rockland Housing Authority will consider the totality of the circumstances in each case, including the seriousness of a case, the extent of participation or culpability of each individual family member, mitigating circumstances relating to the disability of a family member, and the effects of denial of termination of assistance on other family members who were not involved in an action or failure to act, in addition to other considerations provided for in other laws.

17. The plan separately requires the Rockland Housing Authority to provide a family who is facing termination of assistance with a written notice of their opportunity to request an Informal Hearing, and specifically that the notice must state that the deadline to request an informal hearing is within ten (10) business days of the date of the notice of termination.

18. Plaintiffs did not receive the Section 8 Administrative Plan, and the PHA has provided no record that they received the Section 8 Administrative Plan.

19. On or about January 2019, Ms. Leite completed and submitted a Department of Housing and Urban Development ("HUD") Race and Ethnic Data Reporting Form to the Rockland

Housing Authority. On that form, Ms. Leite listed her race as "White," and her daughter's race as "Black."

20. On or about February 2, 2019, Ms. Leite signed a form acknowledging that she received and signed a packet of HUD materials that the Rockland Housing Authority provided her.

21. Certain materials that Ms. Leite signed and received included consent that any applicable housing authority may independently verify a Program participant's sources of income from current and previous employers, and independently from other financial institutions, to determine and evaluate program eligibility and subsidy amounts, among other things.

22. The consent materials separately outlined Plaintiffs' rights to receive income information gathered from these sources, and that the Rockland Housing Authority could not use information received under that consent to reduce or terminate assistance without first verifying the amounts in that income information, whether the tenant actually had access to certain funds, and when the funds were received.

23. The consent materials also noted that Plaintiffs must be given the opportunity to contest any determinations relating to this process.

24. On or about June 2019, based on the information Ms. Leite provided, the Rockland Housing Authority approved Plaintiffs' application.

25. On or about June 12, 2019, Ms. Leite and the Rockland Housing Authority signed a HUD Housing Choice Voucher Program Voucher (the "Voucher"). The Rockland Housing Authority issued Voucher Number 3675703.

26. Nothing in the Voucher's terms and conditions requires a family to affirmatively report income updates or changes to the PHA aside from the obligations outlined in the language described in the preceding paragraph.

27. On or about July 2019, Collin Wilson ("Wilson"), then a manager at the property where the Unit is located, signed and completed a Request for Tenancy Approval – HUD Housing Choice Voucher Program form, listing an August 1, 2019 lease start date, with a monthly rent of $1800. The property, and the Unit, is managed by Hanover Woods, who in turn is managed by Harbor Management Corporation (collectively "Landlord").

28. Shortly thereafter, in an email exchange dated July 23, 2019, Ms. Leite wrote to an agent of the Rockland Housing Authority named Maureen Horton (" Ms. Horton") that Ms. Leite was hospitalized with a severe kidney infection. She also alluded to her reasons for relocating. These included to avoid a previous domestic abuser who was soon being released from jail.  Ms. Leite also described difficulty working in connection with a newborn baby in these communications.

29. On or about July 30, 2019, in response to the same communication from Ms. Horton to which Ms. Leite shared the details in the paragraph above, Ms. Leite complied with Ms. Horton's request to submit a "zero income statement," which Ms. Leite signed and notarized, confirming that she had no source of income outside of assistance from her mother and grandmother.

30. The PHA's records indicate that Ms. Horton – or another agent working for the Rockland Housing Authority – left a handwritten note on a printed copy of the July 23, 2019 email exchange that they were still waiting on a letter from 7-Eleven where Ms. Leite previously worked, that "she [was] no longer working." The note concluded that in the meantime, the Housing Authority would assess Ms. Leite's income at an annualized calculation. Other records demonstrate that this calculation was based on the paystubs submitted relating to her employment at 7-Eleven, or $9,724 a year.

31. On or about August 13, 2019, according to materials that remain in Defendant's file for Ms. Leite, Dr. Kristin Ratliff issued a doctor's letter explaining that Ms. Leite was unable to work because of complications secondary to pregnancy. The letter estimated an October 15, 2019 due date.

32. On or about August 22, 2019, Wilson and Ms. Leite signed a U.S. Department of Housing and Urban Development ("HUD") Office of Public and Indian Housing Form HUD-52641 Housing Assistance Payments Contract ("HAP Contract") for the Section 8 Tenant-Based Assistance Housing Choice Voucher Program relating to Ms. Leite and her daughter's lease of a contract unit at Hanover Woods (the "Unit").

33. The HAP Contract's initial Lease Term began on August 1, 2019 and ended on July 31, 2020. It listed an $1800 rent for the Contract Unit, requiring $1688 to be paid by the PHA. The PHA's files confirm that Ms. Leite's share of the rent was based on the annualized figure calculated by the Rockland Housing Authority's agents on Ms. Leite's 7-Eleven paystubs.

34. The PHA proceeded in letting Ms. Leite enter this lease based on her representations and signed attestation that she was no longer employed at 7-Eleven or receiving income from that position.

35. The HAP Contract notes at length that it is governed by and subject to the Section 8 Program and HUD regulations. Part B, Section 2(a), noted that "[t]he owner has leased the contract unit to the tenant for occupancy by the family with assistance under the Section 8 voucher program." Part B, Section 17(b) provides that the HAP contract shall be interpreted and implemented in accordance with all statutory requirements, and with all HUD

requirements, including the HUD program regulations at 24 Code of Federal Regulations Part 982."

36. The contract further notes the following at Part 3, Section 5(d):

> The tenant is not responsible for paying the portion of rent to owner covered by the PHA housing assistance under the HAP contract between the owner and the PHA. A PHA failure to pay the housing assistance payment to the owner is not a violation of the lease. The owner may not terminate the tenancy for nonpayment of the PHA housing assistance payment.

37. Part 3, Section 8(a) notes under the heading "Requirements" that "[t]he owner may only terminate the tenancy in accordance with the lease and HUD requirements." Section 8(b) lists the only grounds on which the owner may terminate the tenancy:

> (1) Serious or repeated violation of the lease;
> (2) Violation of Federal, State, or local law that imposes obligations on the tenant in connection with the occupancy or use of the unit and the premises;
> (3) Criminal activity or alcohol abuse (as provides in paragraph c); or
> (4) Other good cause (as provided in paragraph d).

38. Section 8(c) lists, in relevant part, the following criminal activity that entitles an owner to terminate the tenancy:

> (a) Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of the premises by, other residents (including property management staff residing on the premises);
> (b) Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of their residences by, persons residing in the immediate vicinity of the premises;
> (c) Any violent criminal activity on or near the premises; or
> (d) Any drug-related criminal activity on or near the premises.

39. Section 8(d), under the heading "Other good cause for termination of tenancy\" (sic) lists the following, in relevant part:

> (1) During the initial lease term, other good cause for termination of tenancy must be something that the family did or failed to do.
> (2) During the initial lease term or during extension term, other good cause may include:
>    a) Disturbance of neighbors

       b) Destruction of property, or

       c) Living or housekeeping habits that cause damage to the unit or premises.

40. Section 10 specifies that "the owner may only evict the tenant by a court action."

41. Section 11 outlines notice requirements for eviction grounds. Those are:

    (1) At or before the beginning of a court action to evict the tenant, the owner must give the tenant a notice that specifies the grounds for termination of tenancy. The notice may be included in or combined with any owner eviction notice.

    **(2) The owner must give the PHA a copy of any owner eviction notice at the same time the owner notifies the tenant.**

    (3) Eviction notice means a notice to vacate, or a complaint or other initial pleading used to begin an eviction action under State or local law.

(emphasis added).

42. Section 12 notes that if the HAP contract terminates for any reason, the lease terminates automatically.

43. Beyond this, at no other point did the PHA provide Plaintiffs a written description of the grounds on which the PHA may terminate their assistance.

44. Section 16 prohibits discrimination in this context "[i]n accordance with applicable equal opportunity statues, Executive Orders, and regulations…"

45. Other materials Plaintiffs received in connection with their lease and participation in the Section 8 Program prohibited discrimination, in relevant part, on the basis of race, color, sex, national origin, age, familial status, or disability, and provided elsewhere that eligibility for HUD programs must be made without regard to actual or perceived sexual orientation, gender identity, or marital status.

46. On August 22, 2019, Ms. Leite, Landlord, and the PHA separately prepared a separate Lease Amendment relating to the HAP contract, outlining the PHA's payment obligations at $1688/month, and Plaintiffs' payment obligations at $112/month.

47. The Amendment noted that its effective date was August 1, 2019, and it set Plaintiffs' next re-certification date for August 1, 2020.

48. Language at the bottom of the Amendment indicated the Rockland Housing Authority's direct transmission of the Amendment to Ms. Leite.

49. None of the documentation provided by the Rockland Housing Authority or the Landlord to Plaintiffs required them to provide affirmative notice of any change in Ms. Leite's income or new employment aside from her obligation to comply with the PHA upon its request to assess the housing assistance amounts the PHA would pay.

50. There is also no record that the PHA, through the Rockland Housing Authority as its predecessor, provided Plaintiffs with any written description of the PHA's informal hearing procedures.

51. Finally, the materials the PHA provided to Plaintiffs outlined separate requirements through which the PHA could and would independently gather program participants' income information.

52. Similarly, the same materials outlined no requirement that any tenant was required to supply the PHA with a copy of any notice to quit issued to a program participant under the PHA or its predecessor's administration. Indeed, the only requirements, upon Plaintiffs' information and belief, relating to any notice to quit, eviction notice, or any similar documentation, required participating landlords to directly transmit any such notice to the PHA or its predecessors.

53. For approximately the next seven months, no other documentation exists that after the PHA authorized these lease materials that they made any further attempt to inform Ms. Leite that

10

she needed to provide more information or that she was otherwise in violation of any HUD requirements relating to the Section 8 Program or her lease.

54. In late September 2019, Ms. Leite gave birth to a daughter. The child's father is Adriel Jasen Fonseca-Semedo ("Mr. Fonseca-Semedo"), Ms. Leite's boyfriend of several years.

55. Mr. Fonseca-Semedo maintains a separate residence in Taunton, Massachusetts. In 2019-2020, Mr. Fonseca-Semedo was required by law to live at his address in Taunton in connection with the terms of probation Mr. Fonseca-Semedo was ordered to complete arising from a past conviction. Mr. Fonseca-Semedo never violated those terms and did not live away from his Taunton residence.

56. Due to medical issues, Ms. Leite has experienced significant limitations that have rendered her disabled. As a result of these medical issues, and Mr. Fonseca-Semedo's commitment to help care for the couple's infant child, he would visit the unit to assist with childcare obligations and to spend time with his family.

57. The PHA represents that on December 1, 2019, it issued a letter to all landlords, property owners, and voucher recipients of the Rockland Housing Authority that it, the PHA, was taking over the entire Rockland Housing Authority's Section 8 Administration. Ms. Leite does not recall receiving this letter. Ms. Leite separately received no confirmation that the Rockland Housing Authority's rules and regulations would carry over to the PHA's administration of the Rockland Housing Authority's legacy voucher recipients.

58. At some point on or around February 2020, Ms. Leite suffered a separately disabling injury that eventually required spinal surgery. Ms. Leite required further assistance from her daughter's father around the house as she was regularly hospitalized and heavily medicated during the same time.

59. In or around March 2020, Kimberly Shactman ("Mr. Shactman"), the PHA's Section 8 Coordinator, emailed Ms. Leite in apparent reference to a prior conversation asking Ms. Leite to fill out a separate form and to provide the PHA with a copy of her infant child's birth certificate and social security card. Shactman also asked Ms. Leite for a letter confirming she no longer worked at 7-Eleven and to gather pay stubs from other recent employment where Ms. Leite briefly worked at a Wendy's.

60. Later that night, Ms. Leite responded, saying that she would try to supply this information the next day, but was having some medical difficulties that may delay delivery. She reconfirmed what she previously transmitted to the PHA upon moving to the Unit, that she no longer worked at 7-Eleven and that she was expecting a baby. These assertions, and the lack of any follow-up by the PHA evidence Ms. Leite's good faith understanding that she sufficiently notified the PHA of her 7-Eleven employment status and the impending birth of her child. She also suggested that there would be some delay in receiving documentation of her Wendy's employment.

61. Shortly thereafter, the COVID-19 pandemic led to widespread business shutdowns and other circumstances secondary to the developing public health emergency.

62. During this period, Ms. Leite continued to require hospital visits due to her medical issues.

63. Later in March 2020, attorneys representing the Landlord sent Ms. Leite notices to quit based on the unsupported assertion that Mr. Fonseca-Semedo was living at the Unit and, as such, stayed at the Unit over the fourteen-day threshold for guests listed in the lease. The notice to quit provided no supporting documentation or other information underlying that assertion. Upon information and belief, the Landlord sent these notices to the PHA.

For example, one notice copied the Rockland Housing Authority at the cc line, which was visible on the notice.

64. The Landlord would later admit that it never actually verified if Mr. Fonseca-Semedo stayed past the threshold listed in Ms. Leite's lease and that it would make the notices to quit disappear if Mr. Fonseca-Semedo applied to live at the home and submitted to a background check. The Landlord's only basis was that its staff sometimes saw Mr. Fonseca-Semedo on the premises with the family, and that he and Ms. Leite made preliminary inquiries with the Landlord on the possibility of his moving in with the family at the Unit.

65. Indeed, the Landlord abandoned their eviction action tied to the March 2020 notices to quit arising from their unsupported assertions that Mr. Fonseca-Semedo was illegally residing at the Unit.

66. On March 23, 2020, the Landlord's manager – whose employment with the Landlord has since ended – forwarded an email from the Landlord's counsel to Ms. Shactman that summarized a phone conversation with a personal advocate that was helping Ms. Leite navigate her housing and disability issues. The email describes his statements that Ms. Leite was disabled and that she perceived the Landlord's notices as discrimination. In later sworn testimony, neither the Landlord's manager nor Ms. Shactman answered Ms. Leite's counsel's questions on why they exchanged these emails or the context for doing so.

67. On April 14, 2020, the PHA, via a third-party agent, notified the Landlord that it was conducting an annual inspection of the unit on May 5, 2020. There is no record they informed Plaintiffs of the same inspection.

68. On April 22, 2020, Ms. Shactman sent Ms. Leite an email saying that she was still missing documents that Ms. Shactman previously collected, and threatened to start the termination process. Ms. Shactman also noted receipt of the Landlord's notice to quit and said that if Ms. Leite and her family were evicted from the apartment, it was automatic grounds to terminate the Voucher.

69. Ms. Leite responded within the hour, asserting that she sent the requested materials before the pandemic shutdowns. Ms. Leite further objected to the PHA's termination threat during the pandemic and referred to what she understood her rights were under federal disability laws. She concluded by offering to resend the requested materials.

70. Despite these notices, the PHA never took any action to explore how to accommodate Ms. Leite or engage in an interactive process to assess her disabled status.

71. Ms. Leite and Ms. Shactman then connected over the phone, which Ms. Shactman memorialized in a subsequent email to Ms. Leite. Ms. Shactman listed a series of documents that she said the PHA still needed to receive from Ms. Leite. Among these, were confirmations that Ms. Leite no longer worked at Wendy's after Ms. Shactman called the company separately. According to Ms. Shactman, the Wendy's employee records suggested that Ms. Leite remained an active employee, but their staff were unable to answer when Ms. Leite stopped actually had last worked at the company. Ms. Shactman also stated that the PHA would always allow a new family member to a unit if and where requested if the addition was connected with the birth of a child. To start that process, Ms. Shactman requested Ms. Leite provide her infant daughter's birth certificate, social security card, and citizenship form.

72. In the next several days, despite assertions by Ms. Leite and her advocate that Mr. Fonseca-Semedo did not live at the property, Ms. Shactman continued to press the issue of how and why Ms. Leite needed to request permission for Mr. Fonseca-Semedo to be added to the unit. Ms. Shactman asserted, without support, that Ms. Leite had an "unauthorized occupant" living with her. Ms. Shactman would later testify under oath that the PHA did not actually confirm whether Mr. Fonseca-Semedo was living at the unit without permission.

73. Ms. Leite and her advocate further noted that collecting these documents was difficult because of the COVID-19 pandemic and Ms. Leite's health issues. They described separate issues where Ms. Leite's children were experiencing harassment because they were bi-racial.

74. In or around the same period, the PHA sent Ms. Leite a separate Annual Recertification Notice to Tenant, signed by Ms. Shactman and other PHA staff. The letter was dated April 23, 2020 at the top of the letter, above Ms. Leite's name and address. The letter's first paragraph required Ms. Leite to provide certain information for recertification by May 29, 2020. The date of this notice and related deadlines did not align to the annual recertification schedule outlined in the policies that applied to Ms. Leite, further confounding the process.

75. Only days later, the PHA's counsel served Ms. Leite with a letter titled "Notice of Termination of Section 8 Rental Assistance and Program Participation," dated May 1, 2020 at the top of the letter, above Ms. Leite's name and address. The second sentence of the letter explained that Ms. Leite's participation in the Section 8 Housing Choice Voucher Program and related rental assistance will terminate effective May 31, 2020.

76. The letter provided several reasons, including that Ms. Leite failed to "provide information and documentation necessary for [her] continued participation in the Housing Choice Voucher Program."

77. The letter further stated, without support or investigation that Ms. Leite allowed her fiancé to live in the household as an unauthorized member without reporting it. Ms. Shactman would later admit in sworn testimony that the PHA never confirmed whether Mr. Fonseca-Semedo was actually residing at the house beyond time allowed under Ms. Leite's lease.

78. It also explained that Ms. Leite changed jobs from 7-Eleven to Wendy's without reporting it to the PHA and that she failed to report her child's birth, despite the nature and content of various prior communications between Ms. Leite and the PHA.

79. Finally, the letter said cited the March 19, 2020 Notice to Quit and its underlying reasons, and further asserted that Ms. Leite failed to provide the PHA with the notice to quit, despite the PHA appearing conspicuously in the cc line in the Notice to Quit and the PHA's other policies.

80. The letter provided no information or other statements on the source of the PHA's information for its assertions, and it attached no documentation.

81. The PHA noted its assertions "indicate[d]" violations of 24 C.F.R. §982.551(b)(1), 24 C.F.R. §982.551(b)(2), 24 C.F.R. §982.551(b)(4), 24 C.F.R. §982.551(e), 24 C.F.R. §982.551(g), and 24 C.F.R. §982.551(h)(2). It concluded that the PHA could accordingly terminate Ms. Leite's assistance in accordance with 24 C.F.R. §982.551(c)(1)(i). The Notice states that "[t]he Federal regulations cited above are enclosed herein and incorporated by reference," although no record exists that the PHA in fact enclosed anything of the sort.

82. The Termination Notice required Ms. Leite to request an informal hearing by the close of business no later than ten (10) business days "from the date listed above." Nothing else clarified that this instruction was not referring to the May 31, 2020 date listed earlier in the notice. Ms. Leite understood the deadline was May 31, 2020 based on these instructions and the May 29, 2020 deadline in the recertification notice from a few days earlier, including the placement of dates in that letter.

83. The Termination Notice did not describe any requirements as to the form or content of the request for an informal hearing and it permitted Ms. Leite to deliver any such request via email to Ms. Shactman.

84. Moreover, the same paragraph noted that if Ms. Leite was disabled under applicable laws, she had the right to request a reasonable accommodation to resolve the program violations if there was a connection between her disability and these program violations.

85. This further complicated the Termination Notice's procedure to request an informal hearing or to challenge termination: namely, whether a reasonable accommodation request carried the same effect as a hearing request.

86. Later communications and actions by Ms. Leite evidenced her reasonable confusion on the process to avoid termination of her voucher. This included Ms. Leite's continued work with the PHA to locate additional documentation, including, but not limited to, a May 5, 2020 transmission of records relating to her infant child, and other medical information. Ms. Leite also reasonably believed that her communications following receipt of the termination notice corresponded to notice that she was working to prevent termination, while also complying with the PHA's earlier recertification notice.

87. Further confounding the process, and despite this notice, the PHA responded and continued to exchange emails with Ms. Leite about updated information that she needed to gather, conveying that the process to maintain her voucher was ongoing. In the next three weeks, Ms. Leite delivered the remaining documentation to the PHA that Ms. Shactman said were outstanding. These were largely follow-up materials to previous documentation Ms. Leite furnished, like updated hospital records regarding her daughter's birth. Ms. Leite relied on the PHA's express and implied representations during this time period that if she successfully submitted the outstanding information, the PHA would not terminate her voucher. These included emails from Ms. Shactman as early as May 6, 2020, only days after the PHA sent its termination notice.

88. On Tuesday, May 5, 2020, Ms. Leite's doctor provided a letter outlining certain medical issues that required Mr. Fonseca-Semedo's support and assistance in the home. Ms. Leite submitted it to the PHA in an effort to seek a reasonable accommodation relating to her medical issues. The PHA received this note on or before May 6, 2020. This note further evidenced Ms. Leite's good faith attempts to resolve the termination issue, and her objective belief that her deadline to request an informal hearing relating to the Termination Notice was ten days after the May, 31, 2020 date threatened by the notice.

89. On May 15, 2020, the following Friday, the PHA provided separate correspondence to Ms. Leite's doctor's letter, interpreted it as a request for a reasonable accommodation, but denied her request. The PHA noted it would continue to work with Ms. Leite and her healthcare provider(s) to further evaluate and explore her requests and possible solutions that would address her needs. Ms. Leite reasonably believed that the ongoing nature of

these communications evidenced that the process to prevent termination of her voucher also remained ongoing.

90. On or about May 26, 2020, the PHA prepared a HUD Family Report Modification and terminated Ms. Leite and her family's participation in the Section 8 Program.  The form included an erroneous total annual income for Ms. Leite and her household. It provided no notice to Plaintiffs.

91. On May 29, 2020, Ms. Leite and her representative contacted the PHA's counsel to confirm that Ms. Leite provided all documentation that the PHA requested, describing the disability conditions that Ms. Leite experienced, and challenging the PHA's actions. By this point, Plaintiffs had provided all information that the PHA said was outstanding.

92. On June 1, 2020, the PHA's counsel communicated to Ms. Leite that she did not meet certain criteria to receive a reasonable accommodation, and that the next steps Ms. Leite needed to take regarding her reasonable accommodation and termination were in emails and letters that the PHA previously sent. Ms. Leite understood once again that this email indicated the timeline to challenge the termination ruling remained outstanding.

93. Also on June 1, 2020, and consistent with the PHA's actions and communications, and Ms. Leite's own understanding of the language of the termination notice and the other policies relating to her voucher, HUD regulations, and the Housing Choice Voucher program, Ms. Leite prepared, signed, and sent an additional written grievance to the PHA challenging the termination of her voucher and seeking its reinstatement. The PHA, at latest, received the grievance by June 7, 2020.

94. Among other details, Ms. Leite noted that the Landlord's case against Ms. Leite to evict her and her children did not proceed, and she referenced the problematic basis of the Landlord's initial claims.

95. On June 4, 2020, Ms. Leite once more checked in with the PHA to confirm that she sent the PHA all required documentation to retain her voucher.

96. Ms. Shactman responded, saying that Ms. Leite and her children were no longer on the Housing Choice Voucher program. She named the termination date as June 1, 2020.

97. The PHA later contended that Ms. Leite complied with every aspect of the process to challenge her termination, per the notice described above in ¶ 93, except that she submitted it late. The PHA's stated position was that a grievance was due ten days after the date of the Termination Notice, despite the Termination Notice's lack of clarity and the PHA's failure to otherwise provide Ms. Leite with a description of the PHA's informal hearing procedures.

98. Following this, the PHA stopped paying its agreed-upon share of Ms. Leite's rent.

99. Ms. Leite's medical issues worsened under the stress of her inability to pay rent. For example, on or about September and October 2020, she required surgeries to treat her spinal injuries. One operation required incisions through Ms. Leite's throat to access areas that required repair. Due to stress, Ms. Leite suffered infection and wound dehiscence at the incision site, requiring an additional operation. The seriousness of these operations, required bedrest, related medications, and the related pain and suffering subjected Ms. Leite and her family to further emotional trauma.

100.     On October 23, 2020, the Landlord, through a new law firm, served Ms. Leite with a notice to quit, explaining its reasons included nonpayment of rent, and citing termination

of Ms. Leite's voucher. The timing of the notice to quit appears connected to an incident dating two days before the notice where a neighbor called the police on Mr. Fonseca-Semedo. It said that the neighbor was worried he was going to break in to their apartment after seeing him standing nearby. Although the police determined that Mr. Fonseca-Semedo was doing nothing wrong, the notice nevertheless published the dubious and problematic implication that Mr. Fonseca-Semedo was somehow a threat to commit a daylight break-in of the neighbor's apartment simply because of his presence.

101.    Ms. Leite and her children, and Mr. Fonseca-Semedo when he was with the family, had, until that point and since August 2019, experienced ongoing and disturbing harassment based on their racial and family status. This included a number of confrontations where neighbors used racial epithets against Mr. Fonseca-Semedo and Ms. Leite's bi-racial children. Neighbors separately called Ms. Leite a "n***** lover" and made other threats that frightened her children to the point that they were afraid to leave the Unit. These incidents also forced the family to take alternative routes to enter the home. Ms. Leite reported this pattern of harassment and discrimination to the Landlord, but upon information and belief, the Landlord took no action to redress the complaint.

102.    And, in fact, the Landlord suggested that Ms. Leite simply avoid the neighbor because the neighbor had been a problem for the building and had been moved before—in effect acknowledging prior awareness of the discriminatory conduct and ratifying the treatment of Plaintiffs.

103.    In November 2020, the Landlord filed an eviction action in the Southeast Housing Court for Bristol County, Massachusetts.

104.     Ms. Leite filed counterclaims against the Landlord, asserting *inter alia*, discrimination and retaliation based on Ms. Leite and her family's race and family status, and Ms. Leite's separate disability issues. Ms. Leite also filed counterclaims for interference relating to the Landlord's actions and communications with the PHA, including efforts to jeopardize the family's housing voucher.

105.     Upon information and belief, records submitted in connection with the Landlord's lawsuit, and the PHA's own testimony show that the Landlord's staff and the PHA did in fact correspond regarding Ms. Leite and her family situation.

106.     Ms. Leite and her representatives' communications with the PHA offered multiple assertions regarding her concerns that the PHA was continuing the pattern of harassment and discrimination she and her family were enduring from others.

107.     On June 7, 2021, trial went forward on the Landlord's lawsuit against Ms. Leite and Ms. Leite's counterclaims against the Landlord.

108.     Ms. Shactman testified at the trial on the PHA's behalf. In her testimony, she made several admissions.

109.     Ms. Shactman testified that the PHA did not consider the Landlord's eviction notice in terminating Ms. Leite's voucher, despite the content of the May 1, 2020 termination notice.

110.     Ms. Shactman admitted that the PHA never actually confirmed whether Mr. Fonseca-Semedo actually resided at the family's unit in violation of the lease.

111.     Finally, in response to the Landlord's counsel's question, Ms. Shactman testified that if Ms. Leite provided the information the PHA requested, it would not have terminated

her subsidy. Ms. Shactman did not definitively recall if Plaintiffs had indeed provided all outstanding documentation prior to the PHA's termination of the family's Voucher.

112.     Upon Plaintiffs' information, belief, and available records, as described above, to date, Plaintiffs did in fact provide all of the information that the PHA requested, much of which was following Ms. Leite's earlier attempts to provide information, but the PHA responded that it needed other copies of those records. These included, for example, employment records and hospital records that did not in any way change the PHA's knowledge that 1.) Ms. Leite gave birth to a daughter who was living at the unit; and 2.) that Ms. Leite no longer worked for certain employers.

113.     Shortly thereafter, the Housing Court entered judgement in the Landlord's favor. Ms. Leite filed her notice to appeal that ruling, and remains on the premises with her family.

114.     Before and after the trial, Ms. Leite, through her counsel, made numerous attempts to work cooperatively with the PHA to restore the family's voucher, noting the absence of procedural clarity in the termination notice, Ms. Leite's ability to challenge her termination, and the questionable basis of the PHA's reasons for termination. Ms. Leite's counsel sought the Landlord's counsel's cooperation to resolve this issue cooperatively. Despite this, the PHA refused to consideration any restoration of the family's Voucher.

115.     In subsequent conversations, Ms. Leite's counsel asserted that because the PHA conceded that the true reason to terminate the family's Voucher was failure to supply documentation, despite successfully delivering that information, this was, at best and all evidence considered, a technical infraction that was not commensurate to the severe consequences of the PHA's actions, including, but not limited to, rendering a young family headed by a disabled, single parent homeless during a pandemic. This also included the

potential challenges created by the family in applying for a new voucher, which previously took Ms. Leite over five years to finally secure for her family. The PHA's response indicated a specific animosity for Ms. Leite, citing, among other factors, her use of a personal advocate whose help she sought in connection with her disability status, and countered that it may have otherwise reconsidered the termination but for the assistance of that advocate or if this was a different family.

116.    Upon Plaintiffs' information and belief, the PHA understood Ms. Leite's mental and physical disabilities, but proceeded to unlawfully terminate her voucher without permitting Ms. Leite the process and accommodations necessary to supply this information and challenge the termination.

117.    Upon Plaintiffs' information and belief, the PHA, upon assuming control over the administration of Plaintiffs' voucher, targeted the family based on their family situation, disability status, the family's racial composition, and membership in other protected classes.

118.    As a result of the PHA's actions, the Plaintiffs have and continue to suffer significant mental and physical health problems. These include, but are not limited to, increased stress, increased symptoms relating to her preexisting anxiety, PTSD, depression, and other mental health issues, reproductive issues, and a variety of other, secondary health problems that have subjected Ms. Leite to numerous hospitalizations, medical costs, and new medications. As a result of suffering these health issues, Ms. Leite faces added difficulties and hardships to care and provide for her family without assistance, seek consistent employment, or perform other basic life functions.

119.     Plaintiffs have also suffered monetary damages as a result of the PHA's actions, including, but not limited to, inability to pay rent and the fees and costs relating to as much.

120.     Finally, due to her limitations, Ms. Leite is unable to seek new housing for her and her children, and the family remains subject to harassment and discrimination by neighbors at the current property, resulting in further stress and mental health issues for the family.

### COUNT I: VIOLATION OF 42 U.S.C. § 1983

121.     Plaintiffs repeat and incorporate by reference the allegations in Paragraphs 1-120 as though fully set forth herein.

122.     Plaintiffs have a constitutionally protected property interest in their Section 8 Housing Choice subsidy.

123.     The PHA deprived and continues to deprive Plaintiffs of their constitutional and other legal rights by the PHA who was acting under the color of State law.

124.     Throughout the Section 8 termination process, the PHA violated Plaintiffs' due process rights, including, but not limited to, the right to an informal hearing as guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution, U.S. Const. amend. V, XIV, and the First, Tenth, and Eleventh Articles of the First Part of the Massachusetts Constitution, M.A. Const., part 1, arts. I, X, and XI.

125.     The PHA terminated Plaintiffs' participation in the Section 8 Voucher Program in violation of federal law, including but not limited to, the procedural requirements and other provisions of 42 U.S.C. §§ 1437f and 1437c-1 and 24 C.F.R. §§ 982.551, 982.552, and 982.555.

126.     The PHA failed to give Plaintiffs a written description of the PHA's informal hearing procedures, in violation of federal law.

127.     The PHA failed to give Ms. Leite and her family proper instructions to request an informal hearing challenging the PHA's termination of her Section 8 Housing Choice Voucher, including, but not limited to, never delivering a copy of those procedures, in violation of the law, providing confusing and unclear instructions in its termination notice, and, despite its knowledge of Ms. Leite's limitations arising from her known disabilities, continuing to engage her in a manner that confounded any reasonable understanding of her rights and obligations on how to properly challenge the termination process.

128.     The PHA failed and refused to consider all relevant circumstances such as the seriousness of what it alleges were Ms. Leite's violation of her program obligations, the extent or participation of Ms. Leite's young children, mitigating circumstances relating to Ms. Leite's disabilities, and the effects on Ms. Leite's young children who had no role in the alleged failures to comply with the family's obligations under the Section 8 Housing Choice Voucher Program.

129.     The PHA's failure to accord Plaintiffs due process in this respect, and its related policies and instructions that were unlawfully vague, were both unconstitutional and prejudiced Plaintiffs in preventing them from protecting their rights under federal and State law.

130.     Therefore, under 42 U.S.C. § 1983, this Court should vacate and set aside the PHA's decision to terminate, issue a mandatory injunction requiring the PHA to restore Plaintiffs' voucher, and enjoin the PHA from further attempts to terminate Ms. Leite's participation in the Section 8 Voucher Program without proper justification or process.

131.    Plaintiffs also suffered damages as a result of the PHA's unlawful termination of their participation in the Section 8 Program including mental and emotional distress for which they seek compensation together with punitive damages and costs.

132.    The PHA failed to give Plaintiffs a written description of the PHA's informal hearing procedures, in violation of federal law.

133.    The PHA failed to give Ms. Leite and her family proper instructions to request an informal hearing challenging the PHA's termination of her Section 8 Housing Choice Voucher, including, but not limited to, never delivering a copy of those procedures, in violation of the law, providing confusing and unclear instructions in its termination notice, and, despite its knowledge of Ms. Leite's limitations arising from her known disabilities, continuing to engage her in a manner that confounded any reasonable understanding of her rights and obligations on how to properly challenge the termination process.

134.    The PHA failed and refused to consider all relevant circumstances such as the seriousness of what it alleges were Ms. Leite's violation of her program obligations, the extent or participation of Ms. Leite's young children, mitigating circumstances relating to Ms. Leite's disabilities, and the effects on Ms. Leite's young children who had no role in the alleged failures to comply with the family's obligations under the Section 8 Housing Choice Voucher Program.

135.    The PHA's failure to consider these circumstances separately evidence its unlawful discrimination against the family, in violation of federal law, including, but not limited to, 24 U.S.C. § 3604.

136.    The PHA discriminated against Plaintiffs based on their family status, including its selective treatment based on Ms. Leite's status as a single mother of biracial children, and

her relationship with Mr. Fonseca-Semedo. This included, but was not limited to, the PHA's actions based on its biased assumptions of Mr. Fonseca-Semedo and its unjustified, unsupported, uninvestigated, and problematic assertions that he was illegally living in the home.

137.    The PHA discriminated against Plaintiffs based on their disability status, including its selective treatment based on Ms. Leite's health situation and its effect on her childcare needs, her relationship with Mr. Fonseca-Semedo and understandable needs to enlist his help to assist in caring for their infant daughter, its denial of any reasonable accommodation relating to as much, and Ms. Leite's good faith attempts to seek the help of third party disability advocates, and communications of the same to the PHA. The PHA separately understood Ms. Leite's health and mental impairments that prevented her from navigating the PHA's confusing and contradictory certification and termination process, depriving her of reasonable accommodations or an actual interactive process in navigating that process.

138.    The PHA discriminated against Plaintiffs based on their membership in a protected class based on race, color, and national origin, including its selective treatment based on Ms. Leite's status as a single mother of biracial children, and her relationship with Mr. Fonseca-Semedo. This included, but was not limited to, the PHA's actions based on its biased assumptions of Mr. Fonseca-Semedo and its unjustified, unsupported, uninvestigated, and problematic assertions that he was illegally living in the home.

139.    The PHA's disparate treatment against Plaintiffs based on their membership to the aforementioned protected classes harmed Plaintiffs financially, including its ability to pay rent, and cause other damages including physical and emotional distress.

## COUNT II: VIOLATION OF PROCEDURAL DUE PROCESS
### (US Const. Amend. 5, 14 § 1)

140.　　Plaintiffs repeat and incorporate by reference the allegations in Paragraphs 1-139 as though fully set forth herein.

141.　　The PHA failed to provide Plaintiffs with timely and adequate notice detailing the reasons for terminating Plaintiffs' housing voucher.

142.　　The termination notice to Plaintiffs was deficient for a variety of reasons, including, but not limited to, because it did not include the source of information underlying the PHA's assertions, because its instructions were unclear, and the confusion created by sending other notices and deadline surrounding annual recertification around the same period that obscured the Plaintiffs' understanding of the process.

143.　　The PHA also attached no documentation and included inadequate details on the source of information underlying its termination decision, in violation of the law.

144.　　The PHA's notice also failed to attach any materials underlying its sizable references to various federal statutes and regulations that it said justified its termination notice, thereby denying Plaintiffs the information necessary to navigate the already convoluted grievance process.

145.　　The PHA also separately provided Plaintiffs with policies and procedures that indicated terms or requirements that conflicted with or excused them from their obligations enumerated in the cited statutes and regulations, including notices that the PHA would independently and separately receive or seek out information on the family's employment, income, or any notices to quit. These policies were unlawfully vague, and the PHA's actions that were consistent with this policy, its receipt of this information, and its failure to provide any administrative plan or separate policy to the Plaintiffs further violated their

due process rights under the applicable statutes and regulations by further undermining the adequacy and clarity of the Section 8 Process and ultimate process surrounding challenges to the PHA's termination.

146.     The PHA's subsequent conduct prevented Plaintiffs from protecting their rights by convoluting their obligations to challenge the PHA's termination notice, including multiple notices around the same month-long period at issue, and other emails, that led Ms. Leite into the false but mistaken understanding that the process remained ongoing to correct the issues to avoid termination.

147.     Plaintiffs were entitled to clarity in navigating this process and a proper opportunity to challenge the loss of the property rights in jeopardy following the PHA's termination notice.

148.     The PHA denied Plaintiffs the opportunity to have an informal hearing, including to present evidence, to confront and cross-examine witnesses, and to receive a decision for their termination grounded in legal rules in evidence, which named and described the evidence the decision relied on.

149.     The PHA violated and ignored HUD regulations and other requirements promulgated to protect participants' procedural due process rights in the Section 8 Housing Program.

150.     The PHA's actions in this regard prejudiced Plaintiffs by denying them the ability to protect and maintain their rights under Federal and State law, including, but not limited to, the housing laws described herein.

151.     Plaintiffs suffered damages beyond and above these violations, including, but not limited to, monetary damages from inability to pay rent, and emotional and bodily harm

arising from stress, anxiety, and other health issues described herein based on the same violations.

### COUNT III: VIOLATION OF PROCEDURAL DUE PROCESS
### (Mass. Gen. L. c. 30A §§ 1(1), 10 & 11)

152.    Plaintiffs repeat and incorporate by reference the allegations in Paragraphs 1-151 as though fully set forth herein.

153.    The PHA failed to provide Plaintiffs with timely and adequate notice detailing the reasons for terminating Plaintiffs' housing voucher.

154.    The termination notice to Plaintiffs was deficient for a variety of reasons, including, but not limited to, because it did not include the source of information underlying the PHA's assertions, because its instructions were unclear, and the confusion created by sending other notices and deadline surrounding annual recertification around the same period that obscured the Plaintiffs' understanding of the process.

155.    The PHA also attached no documentation and included inadequate details on the source of information underlying its termination decision, in violation of the law.

156.    The PHA's notice also failed to attach any materials underlying its sizable references to various federal statutes and regulations that it said justified its termination notice, thereby denying Plaintiffs the information necessary to navigate the already convoluted grievance process.

157.    The PHA also separately provided Plaintiffs with policies and procedures that indicated terms or requirements that conflicted with or excused them from their obligations enumerated in the cited statutes and regulations, including notices that the PHA would independently and separately receive or seek out information on the family's employment, income, or any notices to quit. These policies were unlawfully vague, and the PHA's

actions that were consistent with this policy, its receipt of this information, and its failure to provide any administrative plan or separate policy to the Plaintiffs further violated their due process rights under the applicable statutes and regulations by further undermining the adequacy and clarity of the Section 8 Process and ultimate process surrounding challenges to the PHA's termination.

158.    The PHA's subsequent conduct prevented Plaintiffs from protecting their rights by convoluting their obligations to challenge the PHA's termination notice, including multiple notices around the same month-long period at issue, and other emails, that led Ms. Leite into the false but mistaken understanding that the process remained ongoing to correct the issues to avoid termination.

159.    Plaintiffs were entitled to clarity in navigating this process and a proper opportunity to challenge the loss of the property rights in jeopardy following the PHA's termination notice.

160.    The PHA denied Plaintiffs the opportunity to have an informal hearing, including to present evidence, to confront and cross-examine witnesses, and to receive a decision for their termination grounded in legal rules in evidence, which named and described the evidence the decision relied on.

161.    The PHA denied Plaintiffs the opportunity to have an adjudicatory proceeding, including to present evidence, to confront and cross-examine witnesses, and to receive a decision for their termination grounded in legal rules in evidence, which named and described the evidence the decision relied on.

162.    The PHA denied Plaintiffs the opportunity to have a full and fair hearing, including to present evidence, to confront and cross-examine witnesses, and to receive a decision for

their termination grounded in legal rules in evidence, which named and described the evidence the decision relied on.

163.     The PHA violated and ignored HUD regulations and other requirements promulgated to protect participants' procedural due process rights in the Section 8 Housing Program.

164.     The PHA's actions in this regard prejudiced Plaintiffs by denying them the ability to protect and maintain their rights under Federal and State law, including, but not limited to, the housing laws described herein.

165.     Plaintiffs suffered damages beyond and above these violations, including, but not limited to, monetary damages from inability to pay rent, and emotional and bodily harm arising from stress, anxiety, and other health issues described herein based on the same violations.

### COUNT IV: DISCRIMINATION (Violation of 24 U.S.C. § 3604)

166.     Plaintiffs repeat and incorporate by reference the allegations in Paragraphs 1-165 as though fully set forth herein.

167.     Plaintiffs are members of several protected classes under federal law. These include disability status – Ms. Leite's medical limitations secondary to spinal injuries, stress, anxiety, PTSD, symptoms caused by Ms. Leite's history of homelessness, as a victim of domestic abuse, and racial harassment. Ms. Leite must use medication to deal with these limitations and impairments, and has previously explored the use of other services, including, but not limited to, service animals.

168.     Ms. Leite's mental and physical impairments substantially limit one or more life activities, including, but not limited to, the ability to maintain consistent employment,

perform basic tasks around the home without assistance, childcare, and certain problems focusing. The latter includes many basic administrative tasks similar to the policies and procedures related to the family's participation in the Section 8 Housing program.

169.    The PHA, upon information and belief and records provided to date, and including, but not limited to, its correspondence with the Landlord, had knowledge of Ms. Leite's disability status.

170.    With this knowledge, the PHA reasonably understood that Ms. Leite required certain reasonable accommodations, including, but not limited to, assistance by third parties, like the individuals she enlisted as her disability advocates and her daughter's father.

171.    The PHA also had reasonable notice that Ms. Leite needed assistance in understanding and navigating the Section 8 Program's policies and procedures. This notice included Ms. Leite's past references to domestic abuse, references to illness, medications, and reliance on third-party advocates for assistance in complying with the PHA's information requests. Upon information and belief, the PHA also understood Ms. Leite's struggles with anxiety, depression, and PTSD, through separate conversations and its correspondence with the Landlord, from whom Ms. Leite separately sought reasonable accommodations at certain points like use of a service animal.

172.    The PHA subjected Plaintiffs to adverse treatment despite its understanding of their disability status, including, but not limited to, failure to engage in an interactive process regarding the need to have her children's father at the home. Written records indicate the PHA accused Ms. Leite of hosting an unauthorized occupant and identifying Mr. Fonseca-Semedo, which it later listed, without support, as a basis for termination.

173.     Shortly after Ms. Leite received the termination notice, she submitted medical documentation of her spinal injuries, which the PHA conceded was a request for a reasonable accommodation, separately evidencing its understanding and obligation that the law does not require persons seeking any such accommodations to communicate or evidence the need for as much in a specific format or by using specific language. The PHA rejected Ms. Leite's request and did nothing to pause termination despite acknowledging that she made this request and after the PHA sent her additional forms. The PHA's response offered that Ms. Leite had the right to challenge its rejection of her request by filing a court lawsuit.

174.     Plaintiffs' familial status qualifies them as members of a protected class. Ms. Leite is a single mother. Ms. Leite's children are biracial. Ms. Leite's youngest daughter requires the care of her father, who does not live in the home, and himself belongs to a protected class.

175.     The PHA made unsupported assertions that Mr. Fonseca-Semedo was illegally staying in the home, did nothing to substantiate those assertions beyond its own assumptions, admitted this in sworn testimony, and subjected the family to disparate treatment by terminating their Section 8 Voucher on this basis.

176.     Plaintiffs' race and color qualifies them as members of a protected class. Ms. Leite is a single mother with biracial children. Acting on the unsupported assumption that the younger child's father was illegally staying in the home, the PHA relied on bias alone by terminating the family's voucher on this basis. The PHA proceeded with this action despite Ms. Leite and her advocate's repeated assertions that Mr. Fonseca-Semedo did not live in the home, and after the Landlord abandoned its eviction case against the family.

177.    The PHA treated Plaintiffs differently based on their protected status. The PHA, through its agents, provided sworn testimony that it never terminated a family's voucher because they had a baby, and implied that if Plaintiffs provided all requested documentation, the PHA would have not terminated the voucher. The PHA took this position despite successful provision of all requested documentation, and the PHA's later statements that it retained the discretion to not terminate a family's voucher or restore it if the discussion related to other program participants.

178.    The PHA treated Plaintiffs differently based on their protected status because they refused to accommodate Ms. Leite's misunderstanding of her requirements to request an informal hearing or provide documents – due in part to the PHA's inadequate, confusing, and unlawfully vague notice, policies, and communications – despite having notice of Ms. Leite's mental and physical impairments. The PHA made subsequent statements that it did this despite being willing in other instances to consider a less severe result for other tenants.

179.    The PHA revealed its discriminatory animus against Plaintiffs by using superfluous and disingenuous bases to terminate Plaintiffs' Voucher, including failure to provide a notice to quit, failure to provide certain income information, and failure to provide information that Ms. Leite's baby was born. The PHA's reliance on pretext exposes its unlawful motive in terminating the Plaintiffs' Voucher.

180.    For example, regarding the Landlord's notices to quit, the policies and requirements that the PHA provided to Plaintiffs outlining their obligations instead outlined requirements that the Landlord was responsible for furnishing the PHA with a notice to quit.

181.     Regardless of the content of those policies and requirements, Plaintiffs had a reasonable basis that any requirement to provide the PHA with a notice to quit was obviated when the Landlord conspicuously added the PHA to the notice to quit issued to Plaintiffs.

182.     Upon Plaintiffs' information and belief, the Landlord and the PHA were corresponding during the period when the Landlord issued the notice to quit. The PHA, through its agents, later admitted that it did not confirm whether Mr. Fonseca-Semedo was actually living at Plaintiff's apartment, despite  this being the basis for the notice to quit and a basis in the PHA's subsequent termination notice.

183.     The PHA also revealed its discriminatory animus that Plaintiffs' failure to report the birth of Ms. Leite's infant daughter was grounds for termination, despite its receiving multiple notices that Ms. Leite was due to give birth and the PHA's subsequent process to gather documentation on her infant daughter. Despite receiving and collecting all information relating to Ms. Leite's daughter despite difficulties obtaining hospital records during the early months of the COVID-19 pandemic, informing Ms. Leite in emails that the PHA never denies adding a family member in the event of a birth of a child, the PHA listed this as a reason in its termination notice.

184.     Finally, the PHA received all income information to confirm Ms. Leite's updated income, and its own requirements outlined its ability to independently procure that information. The PHA collected this information, in addition to assurances by Ms. Leite that she was not working, in advance of any stated periodic or annual recertification.

185.     The PHA, through its agents, later provided sworn testimony that they did not actually consider the notices to quit in terminating Plaintiffs' Voucher.

186.     The PHA, through its agents, similarly testified that it would not have terminated the Plaintiffs' Voucher if Plaintiffs provided all the information the PHA requested, i.e. this was the sole reason for terminating the family's Voucher.

187.     The PHA evidenced its discriminatory animus through these actions, penalizing Plaintiffs and depriving them of their civil and constitutional rights, including, but not limited to, under Federal Housing Law, by basing its termination decision on unsupported bases. These examples demonstrate that these reasons were little more than pretext to terminate Plaintiffs from the program out of bias against the family for Ms. Leite's marital status, status as a single mother, disabled status – vis-à-vis requiring Ms. Leite's need to parental assistance from her daughter's father, and the family's membership in a protected class based on race, color, and national origin.

188.     The PHA evidenced its discriminatory animus by basing its termination notice on unsupported pretext which reveals its selective decision to ignore its own administrative guidelines to assess the severity of the putative violations, particularly against the family's two minor children, against whom no fault, however, hypothetical, could be directed.

## COUNT V: CIVIL CONSPIRACY

189.     Plaintiffs repeat and incorporate by reference the allegations in Paragraphs 1-188 as though fully set forth herein.

190.     The PHA, through its conduct, demonstrated an agreement to act with the Landlord and its agents, with the intention of discriminating against Plaintiffs and unlawfully depriving Plaintiffs, members of at least one protected class, of their constitutional and civil rights, including, but not limited to, those allowed the Fair Housing Act, the Due Process Clause of the 5th and 14th Amendments, and in violation of, *inter alia*, 42 U.S.C.

§ 1983, 24 U.S.C. § 3604, and Mass. Gen. L. c. 151B, § 4(7A), resulting in damages including, but not limited to, loss of the Plaintiffs' voucher and related financial damages, and emotional and bodily harm including stress, anxiety, post-traumatic stress disorder, and medical issues secondary to the same, including, but not limited to, complications following spinal surgery, kidney infections, reproductive issues, and other financial and emotional harm to be proven at trial.

191.     The PHA, through its conduct and in concert with the Landlord, corresponded regarding Ms. Leite, her children, and her family and marital status vis-à-vis Mr. Fonseca-Semedo, to make assertions, that were unsupported and without evidence or confirmation, to deprive Plaintiffs of their civil and constitutional rights, housing, and well-being, causing financial, emotional, and physical harm as described above.

**COUNT VI: CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS (42 U.S.C. § 1985(3))**

192.     Plaintiffs repeat and incorporate by reference the allegations in Paragraphs 1-191 as though fully set forth herein.

193.     The PHA, through its conduct, demonstrated an agreement to act with the Landlord and its agents, with the intention of discriminating against Plaintiffs and unlawfully depriving Plaintiffs, members of at least one protected class, of their constitutional and civil rights, including, but not limited to, those allowed by the Fair Housing Act, the Due Process Clause of the 5th and 14th Amendments, and in violation of, *inter alia*, 42 U.S.C. § 1983, 24 U.S.C. § 3604, and Mass. Gen. L. c. 151B, § 4(7A), resulting in damages including, but not limited to, loss of the Plaintiffs' voucher and related financial damages, and emotional and bodily harm including stress, anxiety, post-traumatic stress disorder, and medical issues secondary to the same, including, but not limited to, complications

following spinal surgery, kidney infections, reproductive issues, and other financial and emotional harm to be proven at trial.

194.     The PHA, through its conduct and in concert with the Landlord, corresponded regarding Ms. Leite, her children, and her family and marital status vis-à-vis Mr. Fonseca-Semedo, to make assertions, that were unsupported and without evidence or confirmation, to deprive Plaintiffs of their civil and constitutional rights, housing, and well-being, causing financial, emotional, and physical harm as described above.

## PRAYERS FOR RELIEF

195.     WHEREFORE, Plaintiffs requests this Court, pursuant to 42 U.S.C. §§ 1981, 1983, 1988, the United States Constitution, the Massachusetts Declaration of Rights, and the Court's own equitable powers, to grant the following relief:

196.     Enter a declaratory judgment that Defendants violated Plaintiffs' due process rights by failing to allow Plaintiffs an opportunity for an informal hearing, as required by 24 C.F.R. § 982.555 and the Federal Civil Rights Act, 42 U.S.C. § 1981 *et seq*.

197.     Enter a declaratory judgment that Defendants violated Plaintiffs' due process rights by refusing to allow, in a timely manner, a full adjudicatory hearing on the merits, as required by Mass. Gen. Laws ch. 30A §§ 1(1) 10 & 11.

198.     Enter an injunction, ordering Defendants to immediately reinstate Plaintiffs' subsidy, to pay any rental benefits amount due and owing to Landlord since June 1, 2020, and continue the payment of Plaintiffs' benefits;

199.     Award compensatory damages to Plaintiffs for the costs they incurred paying during the intervening months, including, but not limited to, those arising from their physical and emotional distress;

200.     Award punitive damages to Plaintiffs for Defendants' willful, egregious, and malicious violation of Plaintiffs' civil rights and their reckless indifference to said violation;

201.     Award Plaintiffs costs of this action and reasonable attorneys' fees, pursuant to 42 U.S.C. §1988;

202.     Grant such additional relief this Court determines just and proper.

**Demand for Jury Trial**

203.     Plaintiffs assert their right to a jury trial on all counts so triable.

Respectfully submitted,
ALYSSA LEITE, and her minor children

By their attorney,

*/s/ P. John Veysey*
P. John Veysey (BBO #693954)
Nelson Mullins Riley & Scarborough LLP
One Financial Center, Suite 3500
Boston, MA 02111
(t) (617)-217-4700
(f) (617) 217-4710
john.veysey@nelsonmullins.com

Dated: May 10, 2022

## VERIFICATION OF COMPLAINT

STATE OF MASSACHUSETTS

County of Suffolk

Alyssa Leite, being duly sworn, deposes and says:

I am the plaintiff in this action. I have read the foregoing complaint and know the content thereof; the same is trust to my knowledge, except as to matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true.

_____
Alyssa Leite

Sworn to before me this 30 day of April, 2022.

_____
Notary Public
Comm of Massachusetts
County of Plymouth
My Commission Expires
January 30, 2026